(No. 20061.—

NETTIE T. SLEMMONS, Defendant in Error, *vs.* THE DIME SAVINGS AND TRUST COMPANY *et al.* Plaintiffs in Error.

*Opinion filed June 20, 1930—Rehearing denied October 11, 1930.*

WALTER S. HORTON, JAY T. HUNTER, MAX MURDOCK, and FRANK J. QUINN, for plaintiffs in error.

SHELTON F. McGRATH, and CLYDE R. BIRKETT, for defendant in error.

Mr. CHIEF JUSTICE DUNN delivered the opinion of the court:

Wilbert I. Slemmons, a resident of Peoria, died on December 5, 1918, leaving a will, by which he devised all his property to his widow, Mrs. Nettie T. Slemmons, and nominated her as executrix without bond. She declined to act as executrix, and on her suggestion the Dime Savings and Trust Company was appointed administrator with the will annexed. Mrs. Slemmons, after the death of her husband, was the owner of two tracts of land in Florida, one of 2354 acres in Duval county and the other of 4110 acres in Brevard county, besides a smaller tract in Florida and another in Kansas. The Duval county land she placed in the hands of Raymond Hillis, of Peoria, for sale. In 1923 she desired to sell the Brevard county land and called upon Clifton W. Frazier, who was the trust officer of the Dime Savings and Trust Company, with whom she had consulted during the administration of her husband's estate as the representative of the administrator, the Dime Savings and Trust Company, for advice in regard to the sale. As a result of her interviews with Frazier, following his advice she sold the land in September, 1923, for $20,000 in cash and conveyed it on December 4, 1923, to Joseph K. Brittain, whose purchase was made on behalf of John W. McDowell and George J. Jobst as well as himself, the three being equally interested in the transaction. The consideration of $20,000 was paid at that time but was held by the Dime Savings and Trust Company, because of some question about the clearing of title, until March, 1924, when it was paid to her, she receiving the $20,000 purchase money less $500 charged by the Dime Savings and Trust Company for its services and $220 for an abstract of title and revenue stamps, making the net amount received by her $19,280. The land was sold later, and on January 7, 1926, Brittain

conveyed it by warranty deed to George C. Hield and Willard J. Hield for $241,400, subject to the general taxes for the year 1923 and subsequent years, the drainage tax of the Melbourne-Tillman Drainage District for the year 1925 and subsequent years, to special assessments for other improvements not then completed and to rights of way for drainage ditches as then laid out by the drainage district, for public roads and highways then existing, and for the railroad of the Union Cypress Railway Company. On August 31, 1926, Mrs. Slemmons filed in the circuit court of Peoria county a bill against the Dime Savings and Trust Company and George J. Jobst, John W. McDowell and Joseph K. Brittain, to whom, by amendment, the Title and Trust Company was subsequently added as a defendant, for an accounting of the profits made by the defendants, or any or either of them, on the purchase of the lands. The bill was based upon the charge that all the defendants except Brittain and the Title and Trust Company sustained a fiduciary relation to Mrs. Slemmons and were interested adversely to her in the purchase of the lands; that they failed to inform her of such interest, and on account of the violation of their trust that she had the right to the benefit of whatever profits were made in the transaction. The bill was answered by all the defendants and was subsequently amended several times, as were the answers. The cause was referred to a special master, who took the evidence and reported it to the court, together with his conclusions and recommendation that the bill be dismissed for want of equity, and upon a hearing upon the pleadings, the report of the master and exceptions to it, the court entered such a decree. Upon appeal by the complainant the Appellate Court for the Second District reversed the decree and remanded the cause for an accounting upon the basis and in accordance with the directions of the Appellate Court. Upon the petition of the respondents a writ of *certiorari* was awarded, and the record has been certified to this court for review.

The vital questions in the case relate to the existence of the alleged fiduciary relation of the plaintiffs in error to the defendant in error and the alleged betrayal of the defendant in error's confidence.

An examination of the evidence discloses these facts: The Dime Savings and Trust Company was appointed administrator in January, 1919, and the administration of the estate was practically completed in 1920 but the administrator was not discharged until December 17, 1926, the estate being kept open for a time on account of assets apparently uncollectible which might possibly become available. On April 21, 1920, the administrator delivered to Mrs. Slemmons some stock and mortgages and $20,069 in cash, which she invested in mortgages purchased from the Dime Savings and Trust Company. Frazier, trust officer of the company, attended to the administration of the estate. He also negotiated the sale of the Kansas land about 1919 or 1920. Mrs. Slemmons received the proceeds of the sale and bought mortgages with them. She had never transacted business, was wholly inexperienced and asked Frazier to help her. He helped her to select the mortgages she bought and she relied on his judgment. He also attended to the sale of some land in Espanola, Florida, which she owned, and also some land in Walton county, Florida. These sales included all her Florida lands except the 4110 acres in Brevard county and the 2354 acres in Duval county. Her securities were kept in a safety deposit box of the Dime Savings and Trust Company, and prior to the commencement of this suit her investments were all made through this company, which collected principal and interest for her. She purchased some mortgages through this company in the fall of 1926. All mortgages were purchased on the advice of Frazier and other employees of the company—never on her own judgment. She knew nothing about the securities except what they told her.

The defendant in error never saw the Florida land. She only knew it was drainage land and subject to overflow. She supposed it was under water from what her husband, who had seen it, had told her. It was first in the St. John's Drainage District, in which the plan was to drain to the St. John's river. Mrs. Slemmons paid one or two assessments on that project, but it proved to be an engineering failure. They could not drain to the St. John's river and the plan was abandoned. Later the Melbourne-Tillman Drainage District was organized, draining to the Indian river. Assessments were levied on the land, amounting, including interest, to $248,000. Mrs. Slemmons' entire estate, outside of her Florida land, did not exceed $75,000, consisting of her residence in Peoria, worth $25,000, and about $50,000 in securities and other personal property. Early in 1923 she had in mind the sale of this land. She told Frazier that she had an inquiry from prospective purchasers in Bloomington and had corresponded with some persons in Pekin about the land but gave him no further information and mentioned no names—merely referred to the fact. The persons in Pekin were Carl G. Herget and Herman C. Frings, his attorney. Both of them had seen the land in November, 1922, and in March, 1923, had been on it. On their return to Pekin in March they made inquiry through W. T. Irwin, who had been a partner of Slemmons, about the price asked for the land, and received an answer stating that Mrs. Slemmons gave Irwin a selling price of ten dollars an acre. Further correspondence and conversations with Irwin followed. The amount of the assessments was ascertained and a verbal offer of eight dollars an acre was made by Irwin for Mrs. Slemmons. This was not accepted and the matter remained in that condition for a time. In the meantime Mrs. Slemmons received an offer for the land from Earl W. Thompson, who was an extensive dealer in real estate in Florida and the owner of large tracts of un-

improved land requiring the organization of drainage districts to improve them. He was a resident of Palm Beach but resided in Peoria in the summer, and he and his wife were friends of Mrs. Slemmons. He was acquainted with the land and she asked him if he did not think he could sell it for her. He did not undertake to sell it but made her an offer of $20,000 for it, payable in ten years, for which he would give her his unsecured note bearing six per cent annual interest.

Some time after the abandonment of the St. John's Drainage District Mrs. Slemmons again came to Frazier on several occasions in 1923 to consult him about the new Melbourne-Tillman Drainage District which had been organized including her lands, complaining of the heavy taxation, on account of which she was going to have to get rid of the land. She said it was going to be a tremendous assessment, which she could not possibly meet; that it would wipe out her estate entirely if she had to pay it; that she did not have the income to take care of it; that it would take her principal, and something must be done to dispose of the land. Frazier told her he knew nothing about Florida land and suggested that she go down to Florida, but she objected that she did not want to incur any expense; that she might have to lose the land anyway, and she wanted to get what she could out of it without going to any expense. Frazier talked with Thompson and Hillis about the character of the land and the chances of a sale and made such investigation as he could by correspondence with persons in Florida, bankers and real estate dealers, but got no satisfactory information from them. They all wanted long-time contracts, which would tie up the land. The information which he got as to value was that the land was worth from three to five dollars an acre. He told Mrs. Slemmons the result of his correspondence and his reluctance to undertake the business at all and recommended her to put it into the hands of dealers who were familiar with land of that kind.

Mrs. Slemmons was inclined to accept Thompson's offer and asked Frazier's advice about accepting his note. He told her he did not think it was a very good deal; that she was getting no mortgage to secure the note and it ran too long a time. He had a talk with Thompson and told him he did not think it was a good deal—that there should be one-third in cash and a mortgage for the remainder—but Thompson said he did not want to give a mortgage; that the only reason for making the offer was that he was dealing with some Iowa people on a very large tract and he thought he could put in the Slemmons land with his land and make the trade for her, but that if it was tied up with a mortgage he would not be able to do anything with it. He said if she would feel better she might hold the deed. Frazier conferred with other officers of the bank and talked with McDowell on various occasions, but McDowell said he was not familiar with Florida land; that he had never dealt in large outside tracts and did not see how he could be of any help to her. She continued to come to Frazier with reference to a sale or the acceptance of Thompson's note and Frazier again went to McDowell. McDowell finally said if Mrs. Slemmons would give him an agreement with reference to the sale of the land and an option he would undertake to help her dispose of the land. He told Frazier that while he was not familiar with outside land of that type he knew a man in Chicago who had done such work,— a member of the real estate board, who had done colonization work on outside land,—and he would talk to him and see if he could get him interested in that particular land. Frazier reported this to Mrs. Slemmons and she was satisfied to give the agreement and option. She did not want Thompson to know about it, because if he did she would lose the benefit of his offer. She signed an agency contract and an option on August 3, 1923. The agency contract gave McDowell exclusive authority to sell the land until September 5, 1923, at a gross price of $35,000, for a commission

of ten per cent of the sale price. The option was to Joseph K. Brittain for the purchase of the premises at a price of $35,000, which was arbitrarily fixed, Mrs. Slemmons thinking she ought to have $25,000 and McDowell suggesting, "Why not make it $35,000? We can easily come down, if we have to, on the sale." Brittain was not present when the contract and option were signed, but he accepted and signed the option though demurring at the short time it had to run. He said he would do the best he could and see what, if anything, would come of it. He reported that he could not get any interest aroused; that there had been a failure in the district before and nobody wanted to speculate on the property. Soon after giving the option Mrs. Slemmons went to Petoskey. Thompson told Frazier that he understood this option had been given and withdrew his offer, telling Frazier he could advise Mrs. Slemmons that Thompson was no longer interested in the purchase of the land. Frazier did inform Mrs. Slemmons and talked to McDowell about it, telling him that Mrs. Slemmons would be much disappointed in the way the thing had been handled; that she would probably lose out on the Thompson offer, and unless something was done about the option the land would be back on her hands. He urged McDowell on various occasions to do something with the land, and, Brittain not having aroused any interest in the sale of the land, McDowell finally said that if nothing came of the option to Brittain, McDowell would get up a syndicate that would buy the land. Frazier told him he thought they ought to give her $25,000 for the land. McDowell refused, saying he had never seen the land and knew nothing about it, but if Thompson thought the land was worth $20,000 they would get up a syndicate and would give her $20,000, the same offer Thompson made. This was before the expiration of the option.

On August 17 the Dime Savings and Trust Company telegraphed to Mrs. Slemmons, "In case option is not closed

on land would you agree to accept $20,000? Think can get cash. Answer." To this she replied, "Prefer $25,000. Should have $20,000 after expenses paid but abide by your judgment." On the same day she wrote two letters to Frazier. The first was as follows: "Your telegram was received this morning. It was very hard to come to a decision without being able to go over the business affairs with you. I hope Mr. McDowell will be able to get $35,000, but if he finds it impossible feel that I should get $25,000 out of it since I have to pay him 10%. Do not feel that I can have less than $20,000 for myself after expenses are paid. Of course I shall have to pay Mr. McDowell 10% on any deal he makes. Will you please let me know what I shall owe you in case I should consider Mr. Thompson's offer? Cash is much better than Mr. Thompson's note, but there is the 10% to consider. Should like to hear what success Mr. McDowell has. Hope you will do what seems best for me even if it conflicts with my decision." The other was: "Your telegram was received. It is very hard to come to a decision without being able to talk things over. In case Mr. McDowell cannot get $35,000, feel that I should have $25,000 since I have to pay 10%. What will your charges be if I should decide to accept Mr. Thompson's offer? I feel that I must have $20,000 after all expenses are paid, but you are there and I have full confidence in you that you will do the best you can for me even though it conflicts with my decision."

A week later she wrote to Frazier again: "After receiving your telegram I followed it up with a letter. I wrote the note when my room was full of ladies waiting on me to accompany them. After the letter was stamped I realized that I had written it in a hurry and decided not to send it but write another letter. While I was gone my brother came to my room and seeing the letter on my table took it and mailed it. When I returned I wrote another, also in a hurry, and realize that they were both crazy letters. My

brother has been at Burt Lake, the one who lives in South Bend, Ind., and came down and spent the day with me yesterday, and he says, 'Take cash every time.' If it is not asking too much, could you let me hear what progress you have been making, also if you decided to take $20,000 cash? There were 4110 acres to be drained, but since they had to drain the other way there are only 3930.55 acres that can be drained this way."

Frazier wrote to Mrs. Slemmons on August 27: "Your letters at hand and have delayed answering in order to secure, if possible, further information with reference to the sale of your Brevard county land. While the thirty-day option is still in effect we had an inquiry from parties interested whether or not $20,000 cash would be an acceptable proposition to you. This was made net, and the only charges that I know of to be made would be our fee and the expense of an abstract of title. As you will recall, we got the title placed in your name some time ago, and we see no reason why there need be any delay on that point. We are not able to tell you just at this time what our charge would be in the matter, as, of course, there might be considerable work involved in getting the deal closed which we cannot foresee. However, it would not be in any way unreasonable. It looks as though it would be best to accept the $20,000 proposition if parties are willing to go through with it."

On September 5 Frazier wrote Mrs. Slemmons as follows: "As the option which you gave on the Brevard county land expires to-day, we assume that parties are not going to exercise same, as we have heard nothing further from them lately. Mr. Thompson came in a few days ago and stated that he understood such option had been given by you and under the circumstances he was no longer interested in the purchase of this land. After we learned Mr. Thompson's position in the matter we immediately began work on sale of the land to other parties, and as result

of our efforts and not wishing to have you lose out entirely on the deal owing to Mr. Thompson's withdrawal, we believe that we have secured other parties who would be willing to pay you $20,000 in cash. This would be as good, if not better, than Mr. Thompson's offer, as he only intended to give you a note running over a period of years without mortgage security but did state that you could hold the deed. It is better in matters of this kind to obtain the cash and then you have no further difficulties to look out for on the deal. The $20,000 would be net to you, less our charges and the expense of conveying the title, which would mean securing an abstract and placing stamps on the deed, etc. This is the best price obtainable. We tried to increase this to $25,000, but it seemed that these parties knew of Mr. Thompson's offer and would not go any higher. If this is entirely satisfactory will you kindly wire us at once along the following suggestion: 'As option on the Brevard county land is not taken up, you are authorized to sell the 4000 acres at $20,000 cash.' We believe this is the best course to pursue under the circumstances, and as long as Mr. Thompson and Mr. Hillis are not any longer interested, would recommend closing out on this basis."

Mrs. Slemmons sent a telegram authorizing the sale as requested and on September 10 wrote the following letter to Frazier: "Your last telegram was received and I was very glad to hear that the deal had been closed. I also had a feeling of depression, too, that we could not go on as my husband had planned, but this was not to be thought of, and I consider myself a lucky woman to be relieved of such a heavy burden, and that it was a cash sale and accomplished in such a short time. I have been wondering who told Mr. Thompson that I had given the option, also to whom the land has been sold. I had been silent about the option being given, not even writing it to Mr. S. A. Slemmons, though he knew of Mr. Thompson's offer. I heard that Mr. S. A. Slemmons was in Peoria several days after I

left. He is a very close friend of Mr. Thompson. He may have called on you and if you happened to mention it to him I am sure he would tell Mr. Thompson. Mr. Thompson may have gained his information through the Chicago parties and he may have learned of it in an entirely different way. I want to thank you for notifying me so promptly and congratulate you on the sale you have made. Shall arrive in Peoria about September 26."

At this time Frazier went away on a short vacation. He prepared the contracts and left them with his secretary, Miss Carroll. He did not know who the grantee was to be. McDowell said he would let him know later. Frazier left the contracts with Miss Carroll and told her to send them up to Mrs. Slemmons to execute and return. In his absence the following correspondence occurred:

Letter of the Dime Savings and Trust Company to Mrs. Slemmons dated September 11, 1923, as follows: "We are enclosing herewith articles of agreement for your Florida land. The grantee's name has been left blank, as the parties have not decided just how they want this deed made. We are holding the $1000 cash payment. Kindly sign both copies and return to us at your earliest convenience."

Letter of Mrs. Slemmons to Frazier: "Your articles of agreement have been received. I am not returning them until I hear from you again. I have never signed any paper that I did not understand fully. I have not been told who the buyer is, but supposed I would know when the papers were ready to be signed. You have made an explanation through Miss Carroll, but I do not feel that the paper is complete without the buyer's name and do not feel like signing it as it is. Should like to hear from you personally on this matter as soon as possible."

Letter of the Dime Savings and Trust Company to Mrs. Slemmons dated September 17, 1923, and signed "Joseph P. Durkin, Secretary:" "In reply to your communication of the 14th inst. to Mr. Frazier, I beg to advise that the name

of the purchaser to be inserted in the agreement is James K. Brittain. At the time the paper was forwarded to you he was not sure whether he wanted to take it in his name or someone else. Mr. Brittain lives in Chicago. Mr. Frazier is out of the city at the present time on his vacation and he will not return until about October 1. The purchaser's name may be inserted in the agreement before you execute it if you so desire."

Letter of Mrs. Slemmons to Durkin dated September 19, 1923: "Your letter received this A. M. I leave here Sunday eve, Sept. 23, for Chicago, where I shall be on Monday and Tuesday. Would send papers on to have blank filled out so I could sign but fear there would not be time to send them to Peoria and back before I leave here, so I shall take them with me to Peoria and shall attend to it Wednesday or Thursday, Sept. 26th or 27th. If you think should be attended to sooner you can wire me."

The agreement mentioned in the letter of the Dime Savings and Trust Company of September 11 was dated September 8, and, as stated in the letter, the name of the grantee was left blank, as it had not been decided in whose name the title should be taken. Mrs. Slemmons testified that in addition to the letters which have been set out, written by her in September after receiving the agreement, she sent a postal-card to Durkin, the secretary of the Dime Savings and Trust Company, referring to the agreement and stating that she would not sign it until certain things were done; that she afterward changed her mind, signed the agreement with the name of the purchaser to whom the deed was to be made left blank and mailed it to Peoria, and she did not sign it at Frazier's office in Peoria. The great preponderance of the evidence to be referred to hereafter demonstrates that Mrs. Slemmons is mistaken as to the time, place and circumstances of her signing the agreement; that, in fact, she did not mail the papers to Peoria but brought them with her to Peoria on September 25 on her return from Petoskey

in the same condition in which she received them, unsigned, and a day or two later took them to Frazier's office, whereupon he told her that after she had gone North, Thompson came in and said he had learned of the option and was no longer interested; that he told her of his conversation with McDowell and of McDowell's offer; that he had McDowell's check for $1000 as part payment, and that McDowell, George Jobst and Joseph K. Brittain had decided to go into the syndicate to take the land. After advising her of these facts Frazier inserted the name of Joseph K. Brittain in the contracts and Mrs. Slemmons signed them.

A few days after thus signing the agreement for the sale of the land Mrs. Slemmons again came to Frazier's office and told him she was not just satisfied; that she thought she ought to have $25,000; that there were some other persons who wanted to buy the land and she thought she could get $25,000 for it. Frazier told her he would talk to McDowell about it; that if she felt disappointed he wanted her entirely satisfied, and he would tell McDowell what she had told him about the possibility of getting $25,000. He did talk with McDowell, who said they would not give any more than $20,000; that Jobst and Brittain were rather lukewarm about going into the transaction anyway, and if Mrs. Slemmons was not entirely satisfied with it he would just tear up the contracts and check, the deal would be entirely off, and they would be glad if she could sell it for $25,000. Frazier told this to Mrs. Slemmons, and she said if that was the best they could do they could go ahead—that she wanted to sell the land. Accordingly Mrs. Slemmons on December 4, 1923, executed and delivered the deed to Brittain and the $19,000 balance of the purchase money was paid to Frazier, though it was not paid to Mrs. Slemmons because of some objections to the title, as has been stated, until March, 1924.

The value of the land at the time of these negotiations, the latter half of 1923, was speculative. The offer

of Thompson, the purchase of McDowell and his associates and the tentative offer of Herget and Frings, to be mentioned hereafter, were all based upon speculation. Depositions were taken and testimony was heard by the special master in regard to the value of the land, its character, situation and condition, the market for it, and the origin, spectacular progress and collapse of the Florida bubble in 1924, 1925 and 1926. It clearly appears from the evidence that the market value of the land in the fall of 1923 did not exceed five dollars an acre, the highest opinion being from five to eight dollars an acre, while the greater number placed the value at from three to five dollars. Just as clearly it appears that the sudden inflation of value and rapid advance in price of land throughout Florida did not begin before the summer of 1924 and that the excitement raged with increasing violence during 1925, reaching its height early in 1926 and collapsing in that year. There is no evidence that Frazier, McDowell, Jobst, Brittain or the Dime Savings and Trust Company had any knowledge in 1923 of conditions affecting this Brevard county land, lands generally in Florida or Mrs. Slemmons' interest in them, which would have justified any expectation of the sudden, surprising and excessive inflation of price which began gradually within a year, raged violently for perhaps two years and ended suddenly, or would have justified them in advising Mrs. Slemmons to reject an offer of $20,000 for the land. The assessments and taxes for the years 1923 and 1924 paid by the purchasers after the deed to Brittain were $13,811.13, and there were assessments for twenty-three years more, amounting, with interest, to about $240,000 to be paid besides the general taxes. The purchasers bought the land merely as a speculation, expecting to have to carry it eight or ten years and hoping in that time to be able to dispose of it at a profit. They were not acquainted with the land and they were not acquainted with conditions in Florida, but bought relying on Thompson's offer of $20,000 as evi-

dence of value because of his large ownership of, extensive dealing in and supposed comprehensive acquaintance with Florida real estate. When they bought the land, the purchasers, Frazier and the Dime Savings and Trust Company knew nothing about the transaction which Mrs. Slemmons did not know, and Frazier, acting for the Dime Savings and Trust Company, told her all the facts.

There is no question in this case of the liability in equity of a person having a transaction with another to whcm he sustains a fiduciary relation by which the fiduciary has received a benefit, to show, by clear and satisfactory proof, an absence of undue influence, or of the right of the other party to the transaction to avoid it and receive for himself all the profits which the fiduciary has made. However strongly the liability of the fiduciary or the rights of the other party may be stated, the evidence shows here a full compliance by plaintiffs in error with the strictest requirements of the rule. It may be conceded that the Dime Savings and Trust Company and Frazier sustained a fiduciary relation to Mrs. Slemmons throughout the transaction until the payment of the purchase money to her and that McDowell was her agent to sell the land until September 5, 1923. He did endeavor to interest Brittain in the land, but his efforts, to say the most of them, were only a mild success. Brittain, while he had the $35,000 option, did, as he testified, try to learn scmething about the land as to whether it had any real value, and did, in a way, make investigation as to conditions in Florida and tried to dispose of it, but he found no ready sale for the land. It was a speculative deal and in the course of time might materialize and be worth something. He reported to McDowell that he could get up no interest in the matter; that since the failure of the first drainage district nobody wanted to speculate in the property. After this expression from Brittain and Thompson's withdrawal of his offer Frazier urged McDowell to get busy with the option and do something with the land

so that Mrs. Slemmons would not have it left on her hands. McDowell said to him he could tell Mrs. Slemmons that she need not worry about the option; that if nothing was done about it McDowell would get up a syndicate that would buy the land. After some discussion of the price and the terms McDowell made a cash offer on behalf of the syndicate which he proposed to organize, of $20,000, the same amount as Thompson's offer. While the negotiation was pending, on August 17 Frazier sent the telegram to Mrs. Slemmons inquiring if she would accept $20,000 if the option was not closed, and received her reply, and on August 27 wrote the letter referring to the fact that the option was still outstanding but that there was also another offer available if this option was not taken. Since McDowell had not formed his syndicate and did not know who would be in it Frazier could not give their names. On September 5 the letter was written to Mrs. Slemmons informing her that the option had expired and asking her to telegraph authority to sell the land for $20,000 cash, and she did so. She did not know that McDowell was interested in this sale as a purchaser. He was, however, the only purchaser. He had agreed to organize a syndicate and had talked to Jobst about it and they had agreed to invite Brittain to go in. Brittain did not, however, agree to join in the purchase until the contract dated September 8 was presented to him for his approval and signature on September 29, after it had been signed by Mrs. Slemmons. He could have refused to enter into the contract with McDowell. McDowell had entered into the negotiation for the purchase and made his offer for the syndicate which he proposed to form while he was still Mrs. Slemmons' agent to sell, and if she had signed the contract to convey to Brittain without knowledge that McDowell was jointly interested in the purchase there would have been a basis for her rescission or avoidance of the contract on discovery of the fact. Under the facts disclosed by the evidence, however, there is no basis for

rescission or avoidance. When Mrs. Slemmons was notified that her land was sold, when she received the articles of agreement with the name of the purchaser blank, when she declined to sign them for that reason and wrote the postal-card that she would not sign until certain things were done, she was at Petoskey, surrounded by her friends. She testified that when she received the contract before it was signed she told a few people about it, as she did not know what to do about signing with the name of the purchaser blank. The question of McDowell's interest in the property was apparently a question of some interest at Petoskey. Mrs. Slemmons' attention was directed to it. She recalled the name of one lady, a very good friend, whom she told that the contract came blank as to the name of the grantee, who replied that Mrs. Slemmons would find that McDowell would have the property. For this reason, or some other satisfactory to her, she did not sign the articles of agreement and wrote that she would not until certain things were done. Later she wrote on September 19 that she would leave Petoskey on Sunday evening, September 23, for Chicago, where she would be on Monday and Tuesday; that she would send the papers to have the blank filled so she could sign, but feared there would not be time to send them to Peoria and back before she left Petoskey, so she would take them with her to Peoria and attend to it Wednesday or Thursday, September 26 or 27. She did leave Petoskey Sunday evening, September 23, arriving at Chicago the next morning, spent Monday and Tuesday in Chicago and arrived in Peoria at ten o'clock on Tuesday night, the 25th. She testified to her impression that she mailed the articles of agreement two days before she left Petoskey, on September 21. It just seemed that she mailed them about two days before she left, but she was not positive. She thought she sent no letter with them—just inserted both copies in an envelope addressed to Frazier. Brittain's name was not in the agreement and no name was signed to it

but her own.   She testified she got home September 25, did not go down to the trust company's for several days, and Frazier gave her the duplicate signed with Brittain's name.

It has been mentioned that Carl G. Herget and Herman C. Frings were negotiating for the purchase of this land in the summer of 1923.   They had progressed to a point where Mrs. Slemmons had made a verbal offer of the land at eight dollars an acre through W. T. Irwin, which was not accepted and the negotiations rested for the summer.   Herget and Frings had decided to make Mrs. Slemmons an offer, and in September, Frings, representing Herget, went to Irwin's office for the purpose.   He made an offer through Irwin of $20,000 for the land, subject to the right of further investigation—ten days to go down and look at the land.   Irwin called Mrs. Slemmons on the telephone and told her the parties were ready to make an offer.   Then he said, "What is it?" and turning to Frings remarked, "She has sold the property."   He said then, "Is it all signed up?   Is it all closed?" and told Frings that she had sold the property to George Jobst and John McDowell for $20,-000.   Frings made a memorandum, "September 29, 1923, Irwin reports tract sold."   Frings reported to Herget that the land was sold.   Herget testified that Frings went as his representative to Irwin and upon his return reported that Mrs. Slemmons had sold to McDowell, Jobst and Brittain.  Irwin testified to the same interview with Frings and to Irwin's telephone conversation with Mrs. Slemmons in which she told him that she had sold to McDowell, Jobst and a Chicago man just a short time before.   Mrs. Thompson testified that Mrs. Slemmons told her a day or two after Mrs. Slemmons' return from Michigan that she had sold the land to McDowell, Jobst and a Chicago man for five dollars an acre.   Brittain had not agreed to take the title as purchaser and assume the liabilities of the contract when it was signed by Mrs. Slemmons and did not do so until it was presented to him in Chicago for his approval and accept-

ance, signed by her, and he then accepted and signed it and Frazier delivered one of the duplicates to Mrs. Slemmons.

McDowell and Jobst were directors in the Dime Savings and Trust Company but were not for that reason disqualified to transact business with her or become purchasers from her personally. McDowell's employment to sell the land, which ended on September 5, created a fiduciary relation to her which entitled her to the benefit of his honest efforts to sell the land and disqualified him from purchasing or acquiring any interest in the lands of which she was not fully informed. This fiduciary relation, however, did not affect the execution of the articles of agreement by Mrs. Slemmons. She was then fully informed that McDowell was interested as a purchaser of her land and she was fully advised of her own interest. She was a woman sixty years old, without business experience, possessed of a small fortune, only $50,000 of which was income-producing. The land in question here was subject to a heavy incumbrance, requiring annual payments of amounts greatly in excess of any income which she could reasonably expect to receive, and she was desirous to sell it. She got the price which she was willing to accept, which was the best offer made to her and was the full market value of the land. The sudden rise of prices which followed could not reasonably have been anticipated and cannot be taken into account in the consideration of the adequacy of the amount she received. The evidence shows no unfairness, concealment of any material circumstance or advantage taken, and does show entire good faith, a scrupulous consideration of Mrs. Slemmons' interest, and, before her execution of the contract, a full disclosure of every circumstance of the transaction. When Mrs. Slemmons returned from Petoskey with the articles of agreement unexecuted her suspicions of McDowell had been aroused. She saw Frazier at his office and had a conversation with him in which the whole history of the transaction was given to her in detail. With full knowledge of

every fact her decision was made and she executed the contract. Its later execution by Brittain completed the transaction except the execution of the deed and the payment of the consideration. The evidence fully establishes the fairness of the transaction, that it did not proceed from undue influence, that it was for her interest and that it was an advantageous sale for her. The subsequent unexpected change of conditions could not affect the character of the transaction completed in September, 1923.

The Title and Trust Company, which was made a defendant by amendment to the bill, had nothing to do with the transaction. Its stockholders were the same as those of the Dime Savings and Trust Company and its stock was held in trust for the benefit of its stockholders by the Dime Savings and Trust Company. McDowell and Jobst were directors in both corporations. The corporations were, however, distinct, separate entities, not answerable in any way for the liabilities of one another from the mere fact of their relation. McDowell was manager of the real estate department of the Title and Trust Company under an agreement by which all fees and commissions should be credited to that department, and the net earnings, after payment of expenses, one-half to McDowell and one-half to the Title and Trust Company. Neither McDowell nor the Title and Trust Company received any commission on the sale to Brittain. No commission accrued on that sale except to the Dime Savings and Trust Company. A commission of five per cent on the sale made in January, 1926, was paid to McDowell, the amount of which ($12,330) was paid to the Title and Trust Company under McDowell's agreement with the company, and it is contended that the Dime Savings and Trust Company, because of the relation between the two trust companies, had an interest in this commission which was not disclosed to Mrs. Slemmons at the time she executed the contract. The question of the commission which might be paid by the purchasers on the future sale or

sales of the land, or any part of it, had nothing to do with her agreement to sell. That question was for the purchasers alone to agree upon. Mrs. Slemmons, when she executed the contract, knew that McDowell was one of the purchasers and she dealt with him as a purchaser. After she had so dealt with him, and with full knowledge of his interest had executed the contract of sale, McDowell owed her no further duty. (*Linn* v. *Clark,* 295 Ill. 22; *Glover* v. *Layton,* 145 id. 92.) An agreement among the purchasers as to their division of the profits could no longer concern her. The agreement as to the commission among McDowell, Jobst and Brittain was that no commission should be charged for the sale of the property to the syndicate but that if the property was sold at a profit the Title and Trust Company would get five per cent of the sale price. It was necessarily made after Mrs. Slemmons had signed the contract, for it was not until after that time that Brittain consented to become a member of the syndicate and to take the title. While the contract was incomplete until Brittain's execution of it he had been consulted and it was expected that he would agree to its terms, and when he did so and signed the articles of agreement the contract was complete. Neither the Title and Trust Company nor the Dime Savings and Trust Company knew of the existence of the agreement for the commission until the payment of the money to the Title and Trust Company after the sale to the Hields.

Not all of the evidence in the record has been referred to in this opinion. It is unnecessary and would be unprofitable to prolong the opinion by a more detailed statement of it. We have set out enough, in our judgment, to show the justice of the conclusions of the circuit court and of its decree dismissing the bill for want of equity.

The judgment of the Appellate Court is reversed and the decree of the circuit court is affirmed.

*Appellate Court reversed, circuit court affirmed.*